# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

GLENN JOHNSON,

                Petitioner,

                                      CASE NO. 04-CV-70321-DT

v.                                HONORABLE VICTORIA A. ROBERTS

GERALD HOFBAUER,

                Respondent.

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING A CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED ON APPEAL IN FORMA PAUPERIS

Petitioner, an inmate at the Bellamy Creek Correctional Facility in Ionia, Michigan, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for first-degree murder, assault with intent to commit great bodily harm less than murder, and felony firearm which were imposed following a jury trial in the Wayne County Circuit Court in 1997.[1]  Petitioner was sentenced to life imprisonment without the possibility of parole on the murder conviction, concurrent terms of 5-10 years imprisonment on each of the assault convictions, and a consecutive term of two years imprisonment on the firearm conviction.

In his pleadings, Petitioner raises claims concerning the voluntariness of his police statement and the effectiveness of defense counsel.  For the reasons stated below, the Court denies the petition for writ of habeas corpus and denies Petitioner's motion for summary

---

[1]At the time he instituted this action, Petitioner was confined at the Marquette Branch Prison in Marquette, Michigan.  Respondent is the warden at that facility.

judgment.  The Court also denies a certificate of appealability and leave to proceed on appeal *in forma pauperis*.

## I.   <u>Facts</u>

Petitioner's convictions stem from the shooting death of Enrico Flowers and the assault upon four other individuals outside a Kentucky Fried Chicken restaurant on Six Mile Road and Dequindre in Detroit, Michigan on January 22, 1997.  Petitioner, Kendall Jackson, Dwayne Fowlkes, and Keith Coger were charged in the shooting.

Prior to trial, the charges against Keith Coger were dismissed and the trial court ruled that the remaining defendants would be tried jointly with separate juries.  Petitioner also filed a motion to suppress a statement that he made to police following his arrest.  The trial court conducted an evidentiary hearing on the matter.  Detroit Police Officers and Petitioner testified at the hearing.

Sergeant Arlie Lovier testified that Petitioner was arrested during the evening on January 23, 1997.  Sergeant Lovier first spoke to Petitioner on January 25, 1997.  At that time, Petitioner did not appear to need medical attention, nor did he appear to be sleep-deprived or otherwise impaired.  Petitioner was 20 years old, had completed the 10th grade, and could read and write very well.  Sergeant Lovier read Petitioner his constitutional rights.  Petitioner indicated that he understood those rights and signed the constitutional rights form at 1:30 p.m.  Petitioner did not invoke his rights to remain silent or consult with an attorney during the interrogation.  After Petitioner signed the form, Sergeant Lovier waited 45 minutes to take the statement because Petitioner denied knowing what he was talking about when asked about the shooting.  Sergeant Lovier went in and out of the room several times and kept telling Petitioner what other witnesses

2

had said.  Sergeant Lovier denied coercing or threatening Petitioner.  He testified that he took a six-page statement from Petitioner using a question and answer format.  Petitioner's statement was read into the record.  Sergeant Lovier could not recall the exact time during which he spoke with Petitioner, but the prison log revealed the Petitioner was taken from his holding cell at 11:25 a.m. and returned at 4:15 p.m.  Sergeant Lovier did not know whether other police officers spoke with Petitioner.  He also did not know whether Petitioner had been fed or given bathroom privileges prior to his interrogation.  No one else was present during the interrogation on January 25, 1997.

Petitioner testified five officers talked to him between the time of his arrest and when he made his statement.  The first night he was arrested he slept in an interview room and they took him to a holding cell the next day.  He was initially denied food by one of the officers because he would not cooperate and give a statement, but was given food in the holding area.  Petitioner claimed that one police officer and his superior offered him a five-year prison term if he would give a statement.

Petitioner also testified about Sergeant Lovier's interrogation.  He claimed that Sergeant Lovier did not let him use the bathroom and refused to get him food at the start of their interview.  Petitioner further claimed that Sergeant Lovier grabbed him by the collar, slammed him against a wall, and threw him on the floor.  During the interrogation, Sergeant Lovier read from papers indicating that Kendall Jackson had identified him as the shooter.  Sergeant Lovier also spoke to him about his rejection of the five-year deal.  Petitioner stated that he told Sergeant Lovier that he wanted the five-year deal.  He also testified that gave a statement similar to the one he was told was Kendall Jackson's statement.  Petitioner asserted that he was not advised of

3

his rights until after he gave his statement and said that he did not pay attention to the times

noted on his statement.  When shown Kendall Jackson's actual statement by the prosecutor,

Petitioner said that it was not the exact statement provided by Sergeant Lovier, but that it was

close to it.  Petitioner acknowledged that Sergeant Lovier was having breathing problems during

the interview.

Police Officer Shari Oliver testified that she took Kendall Jackson's statement on January

25, 1997.  She read Jackson his rights at 4:30 p.m. and obtained his statement at 6:35 p.m.  Prior

to the interview, she had read Petitioner's statement and talked with other investigating officers.

At the conclusion of the hearing, the trial court concluded that the police testimony was

more credible than Petitioner's testimony and denied the motion to suppress his statement.  The

case proceeded to trial.

During trial, Kendall Jackson and Dwayne Fowlkes accepted plea bargains in which they

pleaded guilty to second-degree murder, four counts of assault with intent to do great bodily

harm, and felony murder.  Petitioner rejected a similar deal and continued with the trial.

The surviving victims of the shooting, Ennis Flowers, Byron Buford, Bryant Holloway,

and Bobby Mitchell testified at trial about the events leading up to the shooting.  Essentially, the

victims testified that they drove to the Kentucky Fried Chicken restaurant around 9:15 p.m. to

get take-out food from the drive-through window.  They ended up going into the restaurant to

place their order.  As the entered their car after leaving the restaurant, two men approached them

and began shooting.  One man had an automatic weapon and one had an assault weapon.  A third

man standing near a light pole farther away also fired at them as they dove for cover.  The men

were injured in various ways and Enrico Flowers was killed.

4

The victims described the shooters as black men ranging in height from 5' 11" to 6' 2" and wearing black or plaid flannel hoods.  After the shooting stopped, two of the assailants ran toward Marx and one ran toward Dequindre.  Bryant Holloway identified Dwayne Fowlkes as the person who shot him in the buttocks with a shotgun, but none of the victims could identify the other shooters.  Holloway initially told the police that he did not recognize any of the shooters.  Bobby Mitchell testified that he was aware of a dispute between Fowlkes and Enrico Flowers which arose a few months before the shooting, but he did not know if the dispute also involved Petitioner or Kendall Jackson.

Sharon Green testified that she heard shots coming from the restaurant at approximately 9:30 p.m. on January 22, 1997.  When she looked out of her window, she saw two men running from Six Mile to a pearl-colored Taurus or Sable car with a driver in it.  The men were dressed in black and medium in height.  A third man carrying a long gun came running and got into the car as it was leaving.  She did not see if the other men had guns.  She reported her observations to police the following day.

Michael Rimson testified that he knew Petitioner and the other defendants, as well as the three of the victims.  On the afternoon of January 22, 1997, he was at Darryl Price's home on Dearing Street when he received a page from Dwayne Fowlkes.  When Rimson returned the call, Fowlkes asked to drop some guns off and said that he was going to kill Enrico Flowers.  At approximately 7:30 p.m., Petitioner arrived at Price's home on Dearing.  They smoked marijuana together and Petitioner indicated that he was going to get Enrico Flowers.  Petitioner stayed about 30 minutes and then was picked up by Keith Coger in a silver-colored Sable.  Fowles and Kendall Jackson were also in the car.  Petitioner and Fowlkes returned to the house between

5

10:00 and 10:30 p.m. that evening.  Petitioner was carrying an AK-47 and Fowlkes had other

guns.  Rimson and Petitioner put the weapons under the mattress in Price's bedroom.  Rimson

also testified that Fowlkes told him that he got Enrico Flowers.

Rimson was at Price's home the next day around 6:45 p.m. when the police came and

demanded entry to look for the guns.  Rimson refused, but then Price came and allowed the

police to enter the house.  Rimson told the police where he hid the guns.  Rimson and the other

men at the house were arrested and taken to the police station.  At the station, Rimson gave a

statement to police and provided a pager number for Fowlkes.  Rimson testified that he was

slapped and punched by one police officer and told that he would be charged with murder unless

he gave a statement.  Rimson provided a statement and was released.  He testified at trial

pursuant to an immunity agreement which prevented him from being charged with accessory

after the fact.

Terrance Fitzpatrick corroborated Rimson's testimony that Petitioner visited the house on

Dearing twice on January 22, 1997 and that Petitioner brought an AK-47 on the second visit.

Medical testimony established that Enrico Flowers died from multiple gunshot wounds.

Police testimony established that a Beretta blue steel automatic, a Hungarian Arms blue

steel automatic, a Smith & Wesson blue steel revolver, an AK-47 assault rifle, a black ski mask,

two assault magazines, and a speed loader were recovered from Price's home on Dearing.

Bullets taken from Enrico and Ennis Flowers were fired from the AK-47 rifle.  Only one of the

spent bullets recovered from the scene of the shooting did not match one of the guns confiscated

from the house on Dearing.  Keith Coger and Dwayne Fowlkes were arrested in Coger's silver

gray Sable on January 23, 1997.

6

Sergeant Woodford denied threatening or assaulting Michael Rimson during the investigation of the shooting.

Sergeant Arlie Lovier testified about his interrogation of Petitioner and Petitioner's police statement. Sergeant Lovier testified that interviewed Petitioner at the police station on January 25, 1997. The log book indicated that Petitioner was taken from his holding cell at 11:25 a.m. and returned at 4:15 p.m. Sergeant Lovier testified that he was recovering from pneumonia and was having difficulty breathing at the time he interviewed Petitioner. Sergeant Lovier denied using threats, force, or promises of leniency to obtain Petitioner's statement.

In his statement to police, Petitioner stated that his uncle, Keith Coger, Dwayne Fowlkes, and Kendall Jackson drove him to the house on Dearing on January 22, 1997 in a gray Sable that belonged to the mother of Coger's girlfriend. Petitioner stayed there for one half hour smoking marijuana and playing a video game. When the other men returned to pick him up, Fowlkes asked him if he would watch his back because he was going to take care of someone. Fowlkes gave Petitioner a black 9 millimeter and told him to stand on the corner at the Kentucky Fried Chicken restaurant and watch for police. They parked the car on Marx near Six Mile and Fowlkes and Jackson walked to the restaurant parking lot. Petitioner went to the bus stop across the street. He saw five or six men exit the restaurant moving toward a blue Monte Carlo. Fowlkes had a pistol and Jackson had an AK-47 and they started shooting. Petitioner ran toward the Monte Carlo and fired 10 to 15 shots until he ran out of ammunition. He heard more shooting as he ran back to Coger's car. As they began to leave, Jackson ran up and they left and drove to Dearing Street. Jackson gave Petitioner the AK-47 to take into the house and Fowlkes went in the back door. Petitioner was dropped off at home.

7

Petitioner offered an alibi defense at trial.  His aunt Valerie Howard testified that Petitioner and Kendall Jackson were playing cards at her flat on Appoline from about 7:00 to 9:00 p.m. on January 22, 1997.

Petitioner testified in his own defense.  He said that he was at the flat on Appoline playing cards until 9:00 p.m. on January 22, 1997.  Then he and Kendall Jackson went to the bus stop and took buses to their respective homes.  Petitioner arrived home at 11:00 p.m.  His sister and her boyfriend were there when he arrived.  He was arrested the next day at Keith Coger's home.  At the police station, his picture was taken and he was placed in a small room.  He was questioned by Sergeant Woodard and another officer.  Petitioner claimed that Sergeant Woodard offered him a five-year sentence if he gave a statement.  Around 4:00 p.m. the next day, Petitioner was taken to a holding cell.  He remained there until he was questioned by Sergeant Lovier the following day.  Petitioner stated that Sergeant Lovier kept coming in and out of the room telling him what other witnesses were saying and telling him that he was going to jail for murder.  During the interview, Sergeant Lovier collared him, pushed him against the wall, and tripped him.  Petitioner admitted that Sergeant Lovier had breathing difficulties during the interview.  Sergeant Lovier claimed to be reading from Kendall Jackson's police statement, which identified Petitioner as the shooter.  Petitioner testified that he based his statement on what he was told about Jackson's statement.  He also said that he was not advised of his rights until after he gave his statement.  Petitioner claimed that he only gave a statement because Sergeant Lovier knocked him around and convinced him that he was being stupid for rejecting the five-year deal.  Petitioner denied participating in the shooting and denied being at the house on Dearing Street on the night of January 22, 1997.

8

At the close of trial, the jury found Petitioner guilty of first-degree murder, four counts of assault with intent to commit murder, and felony firearm.  The trial court subsequently sentenced Petitioner to life imprisonment, concurrent terms of five to 10 years imprisonment, and a consecutive term of two years imprisonment on those convictions.

## II.    Procedural History

Following sentencing, Petitioner filed an appeal as of right with the Michigan Court of Appeals, raising claims challenging the voluntariness of his police statement and the admission of hearsay statements.  The court affirmed his convictions.  *People v. Johnson*, No. 208813, 2000 WL 33539371 (Mich. Ct. App. Jan. 4, 2000) (unpublished).  Petitioner then filed a delayed application for leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Johnson*, 463 Mich. 856, 617 N.W.2d 336 (2000).

On August 31, 2001, Petitioner filed a motion for relief from judgment in the trial court, challenging the trial court's denial of his motion to suppress his police statement and the effectiveness of trial counsel.  The court denied the motion.  *People v. Johnson*, No. 97-001701-03 (Wayne Co. Cir. Ct. Sept. 20, 2001).  The trial court also denied Petitioner's motion for reconsideration on November 27, 2001.  Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied.  *People v. Johnson*, No. 241178 (Mich. Ct. App. Aug. 27, 2002).  Petitioner also filed a delayed application for leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Johnson*, 468 Mich. 876, 659 N.W.2d 235 (2003).

On January 16, 2003, Petitioner filed a motion for new trial with the trial court based upon newly-discovered evidence.  On May 29, 2003, while that motion was pending, Petitioner

filed an initial petition for writ of habeas corpus with this Court, asserting that: (1) he was denied his Fifth Amendment rights where the trial court erred in misquoting his testimony and using that error to deny his motion to suppress his statement; and (2) he was denied his Sixth Amendment right to the effective assistance of counsel when counsel failed to object to the same and to the prosecutor's use of coerced testimony. The Court dismissed his petition without prejudice to allow him to fully exhaust state court remedies. *Johnson v. Hofbauer*, No. 03-CV-72096-DT (E.D. Mich. June 4, 2003). Petitioner subsequently withdrew his state court motion for new trial.

Petitioner dated the present petition for writ of habeas corpus January 6, 2004 and it was filed by the Court on January 29, 2004. Petitioner asserts the following claims: (1) the trial court erred in misquoting his testimony and thereby denying his motion to suppress a statement; and (2) he was denied the effective assistance of counsel when counsel failed to object to the trial court's error and to the prosecutor's use of coerced testimony. Respondent initially filed a motion for summary judgment seeking dismissal of the petition on statute of limitations grounds, which was denied. Respondent filed an answer to the petition on October 6, 2004 asserting that the claims should be denied based upon procedural default and/or for lack of merit. Petitioner has filed a reply to that answer, as well as a motion for summary judgment

## III.   **Standard of Review**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., govern this case because Petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination
>        of the facts in light of the evidence presented in the State court
>        proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"  *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.  "In order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'"  *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the Supreme Court's holdings, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

Lastly, this Court must presume that state court factual determinations are correct. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.   Analysis

### A.   Procedural Default

As an initial matter, Respondent contends that Petitioner's claims are barred by procedural default. Habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. A petitioner's procedural default in the state courts will preclude federal habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. *See Wainwright v. Sykes*,

433 U.S. 72, 85 (1977).  In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures, but also whether the state court relied on the procedural default or, alternatively, chose to waive the procedural bar.  "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  *Harris v. Reed*, 489 U.S. 255, 263-64 (1989).  The last *explained* state court judgment should be used to make this determination.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion.  *Id.*

Here, the Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal the denial of his motion for relief from judgment based upon his failure to comply with Michigan Court Rule 6.508(D).  That rule provides, in part, that a court may not grant post-conviction relief to a defendant on grounds that were already decided against the defendant, *see* Mich. Ct. R. 6.508(D)(2), or on grounds that could have been raised on direct appeal but were not, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom, *see* Mich. Ct. R. 6.508(D)(3).

Respondent asserts that the state appellate courts' decisions were based upon an independent and adequate state procedural rule.  *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000); *but cf. Abela v. Martin*, 380 F.3d 915, 922-23 (6th Cir. 2004) (Michigan Supreme Court's reference to MCR 6.508(D) may not be clear procedural default when a lower court denies relief on the merits).  In this case, however, the record reveals that the state trial court

13

denied relief on the involuntary confession claim pursuant to Michigan Court Rule 6.508(D)(2) because Petitioner had already raised the issue on direct appeal of his convictions. A denial of relief based upon Michigan Court Rule 6.508(D) does not constitute a state procedural ground that is adequate to bar federal habeas review. *See Hicks v. Straub*, 377 F.3d 538, 558 n. 17 (6th Cir. 2004). Moreover, Petitioner argued the same factual/legal basis for his present involuntary confession claim on direct appeal. *See* Defendant's Brief on Appeal, p. 27. The Court thus concludes that Petitioner has not procedurally defaulted his involuntary confession claim.

The same cannot be said for Petitioner's ineffective assistance of trial counsel claims. Petitioner first raised those claims in his state court motion for relief from judgment and the trial court denied relief based upon Petitioner's failure to establish good cause to excuse his failure to raise the claims on direct appeal of his convictions, as required by Michigan Court Rule 6.508(D)(3). Thus, with regard to the ineffective assistance of counsel claims, the Michigan appellate courts' decisions were based upon an independent and adequate state procedural rule. *See Simpson*, 238 F.3d at 407.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his procedural default. Petitioner, however, has not shown that appellate counsel was ineffective. In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a

14

two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel.  First, a petitioner must  prove that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.  *Id*. at 687.  Second, the petitioner must establish that the deficient performance prejudiced the defense.  Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.  *See Jones v. Barnes*, 463 U.S.

745, 754 (1983).  The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on
> appointed counsel a duty to raise every "colorable" claim suggested by a client
> would disserve the ... goal of vigorous and effective advocacy.... Nothing in the
> Constitution or our interpretation of that document requires such a standard.

Id. at 754.  Strategic and tactical choices regarding which issues to pursue on appeal are

"properly left to the sound professional judgment of counsel."  *United States v. Perry*, 908 F.2d

56, 59 (6th Cir. 1990).  Petitioner has failed to show that by omitting the ineffective assistance

of trial counsel claims presented in his subsequent motion for relief from judgment appellate

counsel's performance fell outside the wide range of professionally competent assistance.

Appellate counsel presented the involuntary confession claim on direct appeal, as well as a

claim challenging the admission of a co-defendant's statements, in a well-reasoned brief.

Petitioner has not shown that appellate counsel's strategy in presenting such claims and not

raising other claims was deficient or unreasonable.  Petitioner has failed to establish that he was

denied the effective assistance of appellate counsel.  This Court need not address the issue of

prejudice when a petitioner fails to establish cause to excuse a procedural default.  *See Smith v.

Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Lastly, Petitioner has not established that a fundamental miscarriage of justice has

occurred.  The miscarriage of justice exception requires a showing that a constitutional violation

probably resulted in the conviction of one who is actually innocent.  *Schlup v. Delo,* 513 U.S.

298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal

insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim

of actual innocence] requires petitioner to support his allegations of constitutional error with

new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness

16

accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. Petitioner's ineffective assistance of trial counsel claims are thus barred by procedural default and do not warrant habeas relief.

      B.    <u>Involuntary Confession Claim</u>

As noted, Petitioner challenges the voluntariness of his police statement, asserting that the trial court erred in misquoting his testimony and using that error to deny his motion to suppress his statement.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

The voluntariness of a confession is a mixed question of law and fact. *See Thompson v. Keohane*, 516 U.S. 99, 108-11 (1995). In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Those circumstances include:

1. Police Coercion (a "crucial element")
2. Length of Interrogation
3. Location of Interrogation
4. Continuity of Interrogation
5. Suspect's Maturity
6. Suspect's Education
7. Suspect's Physical Condition & Mental Health
8. Whether Suspect Was Advised of Miranda Rights

17

*Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir.

2004). All of the factors involved in the giving of the statement should be closely scrutinized.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Without coercive police activity, however,

a confession should not be deemed involuntary. *Connelly,* 479 U.S. at 167 ("coercive police

activity is a necessary predicate to the finding that a confession is not 'voluntary' within the

meaning of the Due Process Clause"). The burden of proving that a confession was obtained

involuntarily rests with the petitioner. *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987).

Voluntariness need only be established by a preponderance of the evidence. *Id*.

 In this case, the Michigan Court of Appeals applied the totality of the circumstances test

and concluded that Petitioner's statement to police was voluntary. *See Johnson*, 2000 WL

33539371 at *1-2. Having reviewed the record, this Court is convinced that the state court's

determination that Petitioner's confession was voluntary is neither contrary to United States

Supreme Court precedent nor an unreasonable application thereof or of the facts.

 First, Petitioner has failed to establish police coercion. Although Petitioner testified that

Sergeant Lovier manhandled him, Sergeant Lovier denied assaulting Petitioner or threatening

him. Petitioner has not shown that he was physically injured or that any such conduct induced

him to give a statement against his will. In fact, as noted by the Michigan Court of Appeals,

defense counsel conceded at the suppression hearing that Petitioner was not physically coerced

into giving his statement. *See* Motion Hrg. Tr., pp. 202-03. Although Petitioner asserted that

he was coerced by promises of leniency (a five-year prison deal), the police testimony does not

indicate that such promises were made to Petitioner to induce him to give his statement.

Furthermore, Petitioner indicated on his statement that no promises had been made to him in

18

exchange for his statement.  The trial court found the police testimony more credible than

Petitioner's testimony.  The credibility of witnesses and whether in fact the police engaged in

coercive activity fall within the category of issues to which the presumption of correctness is

applied.  *See* 28 U.S.C. § 2254(e)(1); *Miller*, 474 U.S. at 112; *Pritchett v. Pitcher*, 117 F.3d 959,

964 (6th Cir. 1997) (deferring to state court's finding that police officer testimony regarding

voluntariness of statement was credible); *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir.

1996) (presumption applies to "implicit findings of fact, logically deduced because of the trial

court's ability to adjudge witnesses' demeanor and credibility"); *see also Marshall v.

Lonberger*, 459 U.S. 422, 434 (1983) (federal habeas courts do not redetermine the credibility

of witnesses whose demeanor has been evaluated by the state court).  Petitioner has not rebutted

this presumption with clear and convincing evidence.  Accordingly, Petitioner has failed to

establish that he was subject to police coercion sufficient to overcome his will.

Petitioner has also not shown that the trial court misconstrued his testimony regarding

Kendall Jackson's statement.  The record reveals that the trial court was aware that Petitioner

testified that Sergeant Lovier claimed to be reading from Kendall Jackson's statement and that

Petitioner was not given a copy of that statement.  *See* Motion Hrg. Tr. pp. 99-100.  The trial

court found that Petitioner's testimony about the effect of Jackson's statement (whether read to

him or viewed by him) was not credible given that Jackson's statement was taken after

Petitioner's statement.  This was not an unreasonable determination of the facts, particularly

since Petitioner claimed that he based his police statement on Jackson's statement.  Moreover,

the trial court did not indicate that this matter was the only issue influencing its credibility

decision.  Petitioner has thus failed to sufficiently rebut the trial court's credibility

19

determination.

Additionally, the record indicates that Petitioner was 20 years old at the time he made his police statement, could read and write very well, and had completed the 10th grade. Petitioner was advised of his *Miranda* rights, stated that he understood those rights, and signed a constitutional rights form.  There is no evidence that Petitioner's physical or mental condition was impaired at the time he gave his statement.  Petitioner was held in custody for approximately 40 hours, but was allowed to sleep and was not continuously questioned by police officers.  On the day he gave his statement, he was questioned for less than five hours. Although Petitioner testified that he was denied bathroom use and food by certain officers on occasion while in custody, he has not shown that he was deprived of any necessity for a significant period of time.  Accordingly, having scrutinized the relevant factors, the Court is satisfied that Petitioner's confession was voluntary and that his constitutional rights were not violated by the admission of his police statement into evidence at trial.  Habeas relief is not warranted on this claim.

## V.   <u>Conclusion</u>

For the reasons stated, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

When a federal district court rejects a habeas claim on the merits, the substantial

showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id*. at 336-37.

When a federal district court denies a habeas claim on procedural grounds without addressing the claim's merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

For the reasons stated *supra*, the Court concludes that reasonable jurists would not find the Court's decision that Petitioner's ineffective assistance of counsel claims are barred by procedural default debatable. Additionally, Petitioner has failed to make a substantial showing of the denial of a constitutional right as to each of his habeas claims. No certificate of appealability is warranted in this case nor should Petitioner be granted leave to proceed on appeal *in forma pauperis*. *See* Fed. R. App. P. 24(a).

Accordingly;

**IT IS ORDERED** that the petition for writ of habeas corpus and Petitioner's motion for summary judgment are **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability and leave to proceed on appeal *in forma pauperis* are **DENIED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 21, 2005

The undersigned certifies that a copy of this document was served on the attorneys of record and Glenn Johnson by electronic means or U.S. Mail on April 21, 2005.

s/Carol A. Pinegar
Deputy Clerk